*E-FILED - 3/24/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL JOSEPH CONNOLLY, | ) | No. C 08-2797 RMW (PR) |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| vs. | ) | WRIT OF HABEAS CORPUS; DENYING |
| | ) | CERTIFICATE OF APPEALABILITY |
| D.K. SISTO, Warden, | ) | |
| Respondent. | ) | |

Petitioner, a California prisoner proceeding pro se, filed a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer and a supporting memorandum of points and authorities addressing the merits of the petition. Petitioner filed a traverse. Having reviewed the papers and the underlying record, the court concludes that petitioner is not entitled to habeas corpus relief and will deny the petition.

## PROCEDURAL BACKGROUND

On December 10, 2003, a San Mateo Superior Court jury convicted petitioner of second degree murder (California Penal Code § 187(a)) and found that he personally used a deadly weapon (California Penal Code § 12022(b)). After finding two "3 strike" prior convictions, the trial court sentenced petitioner to a term of thirty-nine years-to-life in prison.

Petitioner appealed the judgment. The state appellate court affirmed the judgment in a reasoned opinion on January 30, 2006. The state supreme court summarily denied a petition for

1    review on May 17, 2006.

2         Petitioner sought habeas corpus relief in the state superior court on December 22, 2006,

3    which was denied on February 16, 2007.  Petitioner's state habeas petitions in the California

4    Court of Appeal and California Supreme Court were summarily denied.  Petitioner filed the

5    instant federal action on June 4, 2008.

6                              **FACTUAL BACKGROUND**

7         On October 21, 2001, George Celentano ("Celentano") was stabbed to death at his

8    residence at 43 Woodrow Street in Daly City.  (Resp't Ex. C, p. 2.)[1]  Joseph Chavez ("Chavez")

9    owned the house and lived there off and on with petitioner, Celentano, Max Toscano

10   ("Toscano"), and Al Sanchez ("Sanchez").  (Id.)  All the men were present or former heroin

11   addicts with criminal records and had been friends for more than 20 years.  (Id.)

12        Chavez testified that Celentano generally took care of the house and although he could be

13   "verbally abusive," was generally a "mellow guy."  (Id.)  Chavez stated that he'd seen Celentano

14   verbally abuse petitioner several times.  (Id.)

15        When Toscano first moved to the house, he was living in the in-law unit at the rear of the

16   house.  (Id. at 3.)  Petitioner started bringing his ex-wife, Cynthia Faddis ("Cynthia"), around the

17   house and Celentano objected to that.  (Id.)  Petitioner then moved to the in-law unit and Toscano

18   moved back into the house.  (Id.)  At the time, Celentano was using heroin and was "pretty sick,"

19   and did not want anyone in the house except that people who lived there.  (Id.)  Tensions

20   between Celentano and petitioner were rising, and three days before Celentano's murder,

21   Toscano told petitioner that it might be better if petitioner found somewhere else to live.  (Id.)

22   Petitioner got mad and said, "one more time and that is it."  (Id.)

23        Lucy Faddis ("Faddis"), Cynthia's mother, testified that petitioner called her at 2:00 or

24   2:30 a.m. on the morning of October 22, 2001.  (Id.)  When Faddis told petitioner that Cynthia

25   was not there, petitioner said that he "just stabbed a man" but didn't know if the man was dead.

26

27        ───────────────────

28        [1] People v. Connolly, California Court of Appeal, First Appellate District, No. A105806
     (January 30, 2006).

1  (Id.) Faddis told petitioner that he could not come to their house.  (Id.)

2      Sanchez, who had known Celentano for 25 years, said that he had not known Celentano

3  to be violent.  (Id.)  On October 22, 2001, Sanchez was asleep at his mother's house when his

4  niece woke him up at 2:30 or 3:00 a.m. and said petitioner was on the phone for him about an

5  "emergency."  (Id. at 3-4.)  Petitioner told Sanchez, "George is dead.  I killed him."  (Id. at 4.)

6  Sanchez did not believe petitioner at first and petitioner repeated, "I'm not kidding.  I killed him .

7  . . he is in the kitchen dead."  (Id.)  Petitioner told Sanchez that he needed moral support.  (Id.)

8  Petitioner sounded calm and never said how he killed Celentano and never offered that he killed

9  Celentano in self-defense.  (Id.)  Sanchez called the police.  (Id.)

10      Public safety dispatcher Bonny Craig ("Craig") received a call from Sanchez at around

11  2:50 a.m.  (Id.)  The jury heard the tape.  (Id.)  Sanchez said that petitioner just called him and

12  said he had stabbed someone with a knife.  (Id.)  Sanchez reported that petitioner did not sound

13  drunk.  (Id.)  Sanchez gave Craig the phone number to the house.  (Id.)  Craig called the house

14  and petitioner answered, initially saying that "nothing's going on right now."  (Id.)  Eventually,

15  petitioner admitted that he had stabbed someone, and said, "This guy jumped on me and, um, you

16  know, I called a friend of mine to tell him to come over here, and um, so, that's it right there.

17  That's all I can say."  (Id.)  Petitioner stated that he did not believe Celentano was breathing and

18  then told Craig that he didn't kill anyone, but that it was self-defense.  (Id.)

19      The police showed up at the house at 2:50 a.m.  (Id. at 5.)  Officers Price and Siapno

20  handcuffed petitioner and testified that petitioner appeared calm and said he acted in self-

21  defense.  (Id.)  Siapno saw no injuries on petitioner.  (Id.)  Officer Alger testified that petitioner

22  said he acted in self-defense, stating that Celentano grabbed him by the neck, although Alger saw

23  no injuries on petitioner's neck.  (Id.)

24      Celentano suffered numerous stab wounds.  (Id.)  Police found that the door to the in-law

25  unit open, lights were on , and a trail of blood led from the front door, across the family room

26  into the kitchen and rear bedroom.  (Id.)  Two knife handles and a bent knife blade were found in

27  a kitchen drawer.  (Id.)  A pathologist testified that Celentano was stabbed six times in the chest,

28  abdomen, and back.  (Id. at 6.)  Wounds found on Celentano's left arm and hands were consistent

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

3

1   with efforts to fend off an attacker. (Id.)  In the pathologist's opinion, the attacker made at least

2   12 and up to 20 separate knife thrusts. (Id.)

3         Crime scene reconstructionist Celia Hartnett concluded that Celentano must have been

4   sitting or slumped forward when he was stabbed. (Id.)  If he were standing when he was stabbed,

5   there would have been bloodstains on areas of his body and clothing, including his trousers or

6   feet, and there was none. (Id.)

7         Petitioner also testified.  He admitted three prior convictions, that he had been imprisoned

8   several times, and that he was a heroin addict for more than 20 years. (Id. at 7.)  Petitioner

9   testified that a few weeks before October 22, Celentano began to complain about petitioner

10  bringing Cynthia to the house, even though she was the mother of petitioner's daughter. (Id.)

11  Petitioner was considering moving out to live with Cynthia. (Id.)  Four or five days before

12  Celentano's death, Celentano tried to re-enter a methadone detox program. (Id.)  At the time,

13  Celentano was drinking 2.5 pints of vodka per day and then following it with beer. (Id. at 7-8.)

14        On the night of the killing, petitioner came home from Kentucky Fried Chicken around

15  1:00 a.m., went to the in-law unit and began listening to music. (Id. at 8.)  At some point, he

16  went to the house to heat up soup. (Id.)  Celentano came into the kitchen, started arguing with

17  petitioner, and then just "freaked out." (Id.)  Celentano had a knife in his hand and attacked

18  petitioner. (Id.)  Petitioner stated that he tried to pin Celentano to keep the knife away from him

19  and that he was scared because they were bouncing and there were knives everywhere. (Id.)

20  Petitioner did not know why it looked like Celentano had been stabbed with different knives.

21  (Id.)  Petitioner stated the whole thing was over in seconds and that he did not want to hurt

22  Celentano; he just wanted to keep Celentano off of him. (Id.)  At the time of the murder,

23  petitioner was 52 years old, 16 years younger than Celentano, bigger, and in better shape. (Id.)

24        Petitioner had a hard time remembering what happened after he stabbed Celentano. (Id.)

25  He admitted that he lied at first to the 911 dispatcher but eventually did tell him that he acted in

26  self-defense. (Id.)  Petitioner was afraid that because there were no witnesses and he had a

27  previous criminal record, that he would not get a "fair shake." (Id. at 9.)  Petitioner stated that

28  was why he lied to a detective when interviewed, saying that when he came home, he found

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

4

1    Celentano lying there.  (Id.)

2                              **LEGAL CLAIMS**

3          Petitioner asserts the following claims for habeas relief:  (1) exclusion of evidence of the

4    victim's aggressive conduct violated his right to present a defense under the Sixth and Fourteenth

5    Amendments; (2) admission of petitioner's statement to the police obtained during a custodial

6    interrogation violated Miranda and his right to counsel; (3) exclusion of evidence regarding the

7    reliability of petitioner's statement and subsequent instructions that the statement was voluntary

8    violated his right to present a defense under the Sixth and Fourteenth Amendments; (4) trial

9    counsel was ineffective for failing to properly move to strike a prior serious felony conviction;

10   (5) appellate counsel was ineffective for failing to raise issue of the trial court's improper denial

11   of the motion to strike a prior serious felony conviction; and (6) trial counsel was ineffective for

12   failing to object to inadmissible evidence of the victim's character, in violation of the Sixth and

13   Fourteenth Amendments.

14                              **DISCUSSION**

15   A.    <u>**Standard of Review**</u>

16         Because the instant petition was filed after April 24, 1996, it is governed by the

17   Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant

18   restrictions on the scope of federal habeas corpus proceedings.  Under the AEDPA, a federal

19   court may not grant habeas relief with respect to a state court proceeding unless the state court's

20   ruling was "contrary to, or involved an unreasonable application of, clearly established federal

21   law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was

22   based on an unreasonable determination of the facts in light of the evidence presented in the

23   State court proceeding."  28 U.S.C. § 2254(d)(2).

24         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

25   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

26   the state court decides a case differently than [the] Court has on a set of materially

27   indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the

28   'unreasonable application clause,' a federal habeas court may grant the writ if the state court

1    identifies the correct governing legal principle from [the] Court's decisions but unreasonably

2    applies that principle to the facts of the prisoner's case." Id.  "[A] federal habeas court may not

3    issue the writ simply because the court concludes in its independent judgment that the relevant

4    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

5    that application must also be unreasonable." Id. at 411.

6        "[A] federal habeas court making the 'unreasonable application' inquiry should ask

7    whether the state court's application of clearly established federal law was 'objectively

8    unreasonable.'" Id. at 409.  In examining whether the state court decision was objectively

9    unreasonable, the inquiry may require analysis of the state court's method as well as its result.

10   Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable"

11   standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.

12   The gloss of clear error fails to give proper deference to state courts by conflating error (even

13   clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

14       A federal habeas court may grant the writ if it concludes that the state court's adjudication

15   of the claim "resulted in a decision that was based on an unreasonable determination of the facts

16   in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The

17   court must presume correct any determination of a factual issue made by a state court unless the

18   petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. §

19   2254(e)(1).

20   **B.    Analysis of Legal Claims**

21       1.    Exclusion of Evidence of the Victim's Aggressive Conduct

22       Petitioner claims that his right to present a defense was violated because the trial court

23   excluded evidence suggesting that, on the night of the stabbing, Celentano could have been

24   violent due to alcohol withdrawal.  (Pet. at 8.)  In order to support the theory that the killing was

25   in self-defense, defense counsel had sought to admit evidence of an incident in 2000 when

26   Celentano was hospitalized and became violent due to alcohol withdrawal.  (Id. at 9.)  The

27   defense's theory was that Celentano was suffering from alcohol withdrawal the night he died,

28   became violent and attacked petitioner, which resulted in petitioner killing Celentano in self-

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

6

1    defense.  (Resp't Ex. C at 19.)  The trial court conducted a hearing out of the presence of the jury

2    to determine admissibility of the evidence pursuant to California Evidence Code § 402.  (Id. at

3    20.)

4         Three witnesses testified: Dr. James Chen, Celentano's treating doctor; Olinda Menezes,

5    a treating nurse; and Gregory Hayner, a chief pharmacists at a substance abuse treatment center

6    who testified as an expert on alcohol withdrawal.  Chen testified that on April 21, 2000,

7    Celentano was brought to the hospital as a result of gastrointestinal bleeding, orthostatic

8    hypertension, and dehydration, which were all thought to be caused by alcohol and heroin abuse.

9    (RT 2393-2396.)  Celentano began exhibiting agitation, shaking, tremors, and hallucinations,

10   which are signs of alcohol withdrawal.  (RT 2398-2402, 2413.)  Chen prescribed medication to

11   calm him.  The next day, Celentano became agitated and pulled out IV lines.  (RT 2439.)  A few

12   days after Celetano was admitted, Celentano became so violent that the medical staff had to

13   abandon an endoscopy procedure, and another physician reported that Celentano became

14   combative.  (RT 2442.)

15        Menezes testified that her notes reflected that security guards were needed to restrain

16   Celentano at the time.  (RT 2465-2469.)  Hayner testified that alcohol withdrawal is much more

17   acute and severe than heroin withdrawal.  (RT 2497.)  He said that people who experience

18   alcohol withdrawal are usually very scared and do irrational things and become very aggressive

19   in the behavior.  (RT 2498-2500.)  Hayner testified that, assuming Celentano's blood alcohol

20   level at the time was 0.03, that was not enough to keep Celentano from going into alcohol

21   withdrawal.  (RT 2520.)  At the conclusion of the hearing, the trial judge indicated her reluctance

22   to allow the testimony to be received into evidence, but left open the possibility it would receive

23   the testimony if petitioner "testifies in such a way as to make this relevant and admissible."  (RT

24   2536, 2540.)  Petitioner subsequently testified at trial, but the court concluded that the proffered

25   evidence was not relevant and ruled it inadmissible.

26        The state appellate court found that the trial court's exclusion of the evidence showing

27   that Celentano had become violent during a previous episode of alcohol withdrawal was

28   erroneous.  (Resp't Ex. C at 25.)  The appellate court noted that "[petitioner]'s evidence that his

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

7

1   victim attacked him because he was then experiencing alcohol withdrawal may not have been

2   particularly persuasive, as the trial court said, *but that does not make it irrelevant*." (Id.)

3   (emphasis in original).) The appellate court concluded that "[a]s attenuated as it may have been,

4   the evidence Celentano attacked [petitioner] because he was then experiencing alcohol

5   withdrawal had probative value with respect to [petitioner]'s self-defense claim. Moreover, the

6   proffered evidence was not claimed by the district attorney (or now by the Attorney General) to

7   be prejudicial to the prosecution." (Id.)

8        However, the state appellate court then applied the harmless error standard from

9   Chapman v. California, 386 U.S. 18 (1967), and concluded that the erroneous exclusion of

10  petitioner's proffered evidence was harmless. (Id. at 26.) Under Chapman, habeas relief is not

11  warranted if any constitutional error is found to be harmless beyond a reasonable doubt.

12  Chapman, 386 U.S. at 24.

13                    a.    Constitutional Error

14        Although the state appellate court found that the exclusion of petitioner's evidence was

15  erroneous under California law, the question in this habeas proceeding is whether the erroneous

16  exclusion of the evidence rose to the level of a constitutional error as petitioner alleges. The

17  Sixth Amendment affords an accused in a criminal trial the right to present a defense. Chambers

18  v. Mississippi, 410 U.S. 284, 294 (1973). And the Due Process Clause "requires that criminal

19  prosecutions 'comport with prevailing notions of fundamental fairness' and that 'criminal

20  defendants be afforded a meaningful opportunity to present a complete defense.'" Clark v.

21  Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485

22  (1984)). The Supreme Court has made clear that the erroneous exclusion of critical,

23  corroborative defense evidence may violate the Sixth Amendment right to present a defense, as

24  well as the due process right to a fair trial. DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th

25  Cir. 2001) (citing Chambers, 410 U.S. at 294, and Washington v. Texas, 388 U.S. 14, 18-19

26  (1967)). In deciding if the exclusion of evidence violates the due process right to a fair trial or

27  the right to present a defense, the court balances the following five factors: (1) the probative

28  value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of

1    evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely

2    cumulative; and (5) whether it constitutes a major part of the attempted defense.  Chia v.

3    Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th

4    Cir. 1985)).  Moreover, the excluded evidence must be so critical to the issue of guilt or

5    innocence that its exclusion violates due process.  Perry v. Rushen, 713 F.2d 1447, 1455 (9th Cir.

6    1983).  The court must also give due weight to the state interests underlying the state evidentiary

7    rules on which the exclusion was based.  See Chia, 360 F.3d at 1006; Miller, 757 F.2d at 995.

8           This court finds that, under the applicable Miller factors, the state court's decision to

9    exclude petitioner's evidence did violate his right to present a defense.  The first factor, the

10   probative value of the excluded evidence, weighs in favor of petitioner because it tends to

11   support petitioner's claim that Celenano was violent on the night he was killed due to alcohol

12   poisoning.  The second factor - reliability - weighs in favor of petitioner because the witnesses

13   consisted of three reliable, neutral professionals: Celentano's treating physician and nurse, and

14   an expert on alcohol withdrawal.  The third factor - whether the evidence is capable of evaluation

15   by the trier of fact - weighs in favor of petitioner since the jury could have heard and evaluated

16   the testimony from the three witnesses, and the prosecution would have had an opportunity to

17   cross-examine them.  The fourth factor - whether the statement is the sole evidence on the issue

18   or merely cumulative - weighs in favor of petitioner because the witnesses' testimony was the

19   heart of petitioner's defense.  The fifth factor also weighs for petitioner because his sole defense

20   was that he killed Celentano in self-defense when Celentano became violent.  In sum,

21   petitioner's proffered evidence was an essential element to his defense, therefore, its exclusion

22   violated petitioner's right to present a defense.  See Chambers, 410 U.S. at 302.

23                          b.    Harmless Error

24          In order to obtain federal habeas relief on the basis of an evidentiary error, a petitioner

25   must show not only that the error was one of constitutional dimension but also, that it was not

26   harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993).  The Brecht standard requires that

27   the federal habeas court determine whether the constitutional error had a "substantial and

28   injurious effect or influence in determining the jury's verdict."  Id. at 637.  A federal habeas

1    court must assess the prejudicial impact of constitutional error in a state court criminal trial under

2    the "substantial and injurious effect" standard set forth in Brecht, "whether or not the state

3    appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond

4    a reasonable doubt' standard set forth in Chapman."  Fry v. Pliler, 551 U.S. 112, 121-22 (2007).

5    When a state court has determined that a constitutional error was harmless, a federal court may

6    not grant habeas relief unless the state court applied harmless error review in an objectively

7    unreasonable manner.  Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003).  Thus, in order to grant

8    habeas relief when a state court has determined that a constitutional error was harmless, a

9    reviewing court must determine that: (1) the state court's decision was "contrary to" or an

10   "unreasonable application" of Supreme Court harmless error precedent; and (2) the petitioner

11   suffered prejudice under Brecht as a result of the constitutional error.  Inthavong v. LaMarque,

12   420 F.3d 1055, 1059 (9th Cir. 2005).

13          Here, the state appellate court's determination that the instructional error was harmless

14   beyond a reasonable doubt was not "objectively unreasonable."  In reaching the conclusion that

15   the exclusion of evidence was harmless beyond a reasonable doubt, the state appellate court

16   considered and analyzed the evidence.  Specifically, it considered that the evidence that

17   Celentano was suffering from severe alcohol withdrawal at the time of death was weak.  (Resp't

18   Ex. C, p. 26.)  The court noted that petitioner told the 911 dispatcher that Celentano was drinking

19   prior to the attack; that there was no evidence that Celentano had been agitated or aggressive

20   prior to the attack; and that Celentano's prior conduct at the hospital was mostly a reaction to an

21   invasive physical procedure attempted on him by the doctors rather than a gratuitous aggressive

22   action.  (Id.)  Also, the self-defense evidence was underwhelming.  First, petitioner did not tell

23   Sanchez or Faddis that he had been attacked and when he spoke with them he was calm.  Second,

24   the forensic evidence was inconsistent with self-defense: the location of the stab wounds were

25   inconsistent with petitioner's testimony; petitioner was bigger, stronger, and younger than

26   Celentano, who was not known to be physically aggressive or violent; petitioner had no marks on

27   his body while Celentano had marks indicating that he was in a defensive position; the forensic

28   evidence indicated that Celentano went down fairly quickly and received his wounds while he

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

10

1   was on the floor either sitting or lying down.  (Id.)  The state court concluded that, "[Petitioner]'s

2   contention that the exclusion of Celentano's aggressive behavior in the hospital undermined

3   [petitioner]'s credibility is not persuasive. [Petitioner]'s conflicting and self-serving statements

4   to the police so profoundly undermined his credibility it is difficult to think it would have been

5   rehabilitated by the evidence of Celentano's prior conduct in the hospital, which was not

6   persuasively shown to have occurred in circumstances similar to those on the day he was killed."

7   (Id. at 26-27.)

8          This court agrees that the evidence showing that Celentano was in alcohol withdrawal on

9   the night he was killed was weak, and there was substantial evidence showing that petitioner was

10  not acting in self-defense.  Under these circumstances, it was not objectively unreasonable for

11  the state appellate court to conclude that it was clear beyond a reasonable doubt the jury would

12  have found petitioner guilty even if the evidence regarding Celentano's previous violent behavior

13  had been admitted.

14         Moreover, even assuming the state appellate court's decision was an unreasonable

15  application of Chapman, petitioner would not be entitled to habeas relief because the erroneous

16  exclusion did not have a substantial and injurious effect or influence in determining the jury's

17  verdict.  See Brecht, 507 U.S. at 637.  This court agrees with the state appellate court's

18  assessment that in light of the evidence presented at trial, the jury would have found petitioner

19  guilty even if the trial court had allowed the testimony establishing that Celentano had been

20  violent in the past due to alcohol withdrawal.  Accordingly, petitioner is not entitled to federal

21  habeas relief on this claim.

22         2.     Miranda Violation

23         Petitioner argues that his statements to the police during a custodial interrogation were in

24  violation of Miranda, and that continued questioning after he requested an attorney violated his

25  Fifth Amendment right to counsel.  (Pet. at 11.)  The California Court of Appeal summarized the

26  series of events as follows:

27                [Petitioner]'s motion to suppress related to statements he made to the police
            in videotaped interviews at the Daly City Police Department after he was brought
28          there by Officer Alger.  The trial court denied the motion, but ordered the district

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

11

attorney to redact portions of the two tapes shown the jury and the transcript given each juror[2] on the ground that "their probative value is outweighed by their prejudicial effect."[3]  (Evid. Code, § 352.)

At 3:31 a.m., shortly after he placed [petitioner] in the room and handcuffed him to a wall, Officer Alger turned on the videotape.  The taping ended approximately five hours later, although [petitioner] was not questioned during much of that time. [Petitioner] was not initially advised of his rights or questioned by Officer Alger, as the interview was to be carried out by Detectives David Boffi and Brian Pon, who were then on their way to the station.  Detective Pon arrived 49 minutes after Alger placed [petitioner] in the interview room, and Detective Boffi arrived an hour later, at 5:20 a.m., when the interview began.  During the lengthy period of time [petitioner] was alone with Officer Alger he spoke freely asking Alger whether Celentano was dead, whether the police had obtained evidence, what would happen if there were no witnesses, and how long he would be detained. [Petitioner] told Alger: "You know I might beat this case, you know it, right?  There's no weapons . . . right?  You guys have to have a weapon."  Alger did not respond to these and [petitioner]'s other questions, periodically telling him, "I'm just the taxi driver," and "like I said, I have no idea what's going on."  [Petitioner] gratuitously expressed anger that Sanchez had called the police, and observed that "I should have walked out the fucking door, that's what I should have did.  I had plenty of time."

[Petitioner] spontaneously expressed conflicting versions of his role in the killing.  At first, he said "I just saw him dead like that.  I did not do anything.  No weapons, I walked in saw him dead, called a friend of mine."  Later [petitioner] suggested a different scenario, telling Alger that Celentano "was a no good piece of shit I wanna tell you right now.  You know he jumped on me, you know, so fuck[,] I wanna have to do what I have to do.  And I ain't gonna change this."  Later, however, [petitioner] reverted to his original story.  When Detective Pon arrived and said he was unable to tell [petitioner] what he was charged with, [petitioner] told him that if he had killed the guy, he could have just walked away.  During the balance of the interview, [petitioner] adhered to the position he did not kill Celentano, suggesting the killer was probably one of Celentano's many enemies. [Petitioner] also raised the possibility that he knew who the killer was, but would not "rat" on him.

When Detective Boffi arrived, he read [petitioner] his <u>Miranda</u> rights,[4] and

---

[2]  After the trial judge told the jury that a videotape was going to be played, she went on to tell jurors that, "[a]s part of that the prosecutor will be distributing to you a transcript of the tape which is to help you better follow what's said.  But you are the exclusive judges of the facts, so if you think something on the tape was said that is different than what the transcript reflects, you should use your own judgment and write in the word you think was said, that sort of thing.  The transcript is just an aid to you.  [original footnote renumbered.]

[3]  Most of the redactions related to references to [petitioner]'s extensive criminal history and numerous commitments to state prison.  [original footnote renumbered.]

[4]  <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>). [original footnote renumbered.]

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

12

[petitioner] indicated he understood them.[5]   [Petitioner] immediately asked where Sanchez was, stating that he had called Sanchez because he saw the body on the floor and was "freaked out."   [Petitioner] told Boffi that if he had killed Celentano he "would've split."   He said he told Sanchez he found Celentano "lying on the floor, blood all over him.  I just got in the house, I just walked in."   When Boffi asked why he had called Sanchez, [petitioner] said, "he's just a friend . . . .  I was so in my shock, I want[ed] him to come over like you know check it out first and then decide what we want to do.  I called you guys and what, you know.  And that's, that's the story."   Continuing, [petitioner] said "I walked in - bang.  You know I don't got no blood on me and no weapons nothing like that, the guy was laying there dead.  They deal dope, you know, that's his fucking problem."   [Petitioner] reiterated that "if I felt guilty I would have split right away," and "I don't got no blood on me or knives or anything like that or guns."

Detective Boffi asked [petitioner] where he had been before he entered the house and discovered the body.   [Petitioner] said he had walked to Albertson's to shop.  When he returned, he walked through the main house and into his rear cottage.  He did not see Celentano at that time, assuming he was "probably . . . in his room or something."   [Petitioner] remained in his cottage, drinking beer, for about an hour, and then went back into the main house where he found Celentano on the floor.  When Boffi asked why he returned to the main house, [petitioner] said, "I checked the time, I forgot to check the time or something.  [¶] . . . [¶] 'Cause I have something to do tomorrow morning I have the clock in the back, and that's it[,] that's my statement there, as far as I'm going without a lawyer.  'Cause I don't know how you guys are, and hey."   Boffi then asked whether, by referring to a lawyer "are you saying[,] are you not gonna talk to us anymore?"   [Petitioner] indicated that, because he had already described the "basic story," there was nothing more to say, asking, "What else should I tell you?"   Boffi said he had many questions, but "you had mentioned a lawyer and I need to know is that what you're saying[,] you want one here[,] or you're just throwing out the word lawyer?"   When [petitioner] said "I'm [sic] want one here because of my situation," Boffi ceased further inquiry, telling [petitioner] he would be taken to Redwood City as soon as "paperwork" related to the processing of his arrest was completed.  Detectives Boffi and Pon remained in the room for about seven minutes after [petitioner] first expressed an interest in having an attorney.

After the interview ceased, Officer Alger asked [petitioner] to provide the

---

[5] [Petitioner] emphasizes that Detective Boffi did not ask him to explicitly waive the rights Boffi had described, and he did not do so.  The transcript of the videotaped admonitions reads as follows:
"DB: So let's go through that.  Okay, you have the right to remain silent.
"MC: Uh-hmm.
"DB: Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present while you are being questioned.
"MC: Uh-hmm.
"DB: And if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wished one.  So Mike, do you understand those?
"MC: Yes.
"DB: Okay.  Okay, why don't you tell me what happened tonight."
[original footnote renumbered.]

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

13

general identification information required by the booking procedure.  When [petitioner] told Alger he needed to "take a leak," Alger said he would take him to the bathroom but first he had to complete "a couple of things."  When [petitioner] asked what he was being charged with, Alger said "probably with murder, but its' not my choice though."  When [petitioner] revealed he was a "disabled vet," Alger said, "[t]hen I would give you a bit of cushion" because "[a] lot of vets are deputies.  [¶] . . . [¶] We try to do you a little favor, you know what I mean."  While Alger worked on the booking sheet, [petitioner] repeatedly inquired whether the police had witnesses or found weapons or other evidence.  Alger did not respond to these requests, telling [petitioner] that only the detectives knew what evidence had been collected and "if you want to talk to them, they need to come back[] in here and do the whole spiel again, that's up to you."  After [petitioner] made further inquiries about the evidence the police obtained, Alger made the cryptic observation: "I'll be honest with you."[6]  At that point, Alger took [petitioner] to the bathroom, as he had requested, where their conversation was not taped.  Alger testified he did not question [petitioner] about the case while they were in the bathroom, but [petitioner] continued to talk, "asking me questions, running scenarios about what if this happened, what if that happened."  At one point, according to Alger, [petitioner] indicated he wanted to speak with detectives again.  Alger then brought [petitioner] back to the interview room and "went out and told the detectives that [petitioner] wanted to speak again to them."  Telling Boffi he had rapport with [petitioner], Alger asked if he could conduct the interview.  When Alger returned to the room and reminded [petitioner] he had earlier expressed an interest in obtaining an attorney, [petitioner] responded, "Well, that doesn't matter, I could change my mind."  Alger told him he let the detectives know this.  Alger then told [petitioner] to "have a seat" and offered him two cigarettes, saying, "Don't say nothing to no body" because "[i]f someone comes in, I'm getting in shit [¶] . . . [¶] [i]f I'm [seen] sitting in here with you."  At that point, Detective Boffi reentered the interview room, saying "we gonna go through that whole thing again, all right?" and [petitioner] answered, "Yeah, okay."

     Alger then gave [petitioner] a written form statement of his <u>Miranda</u> rights and read each right aloud, indicating as he went along where on the form [petitioner] should place his signature or initials if he understood.  Alger emphasized [petitioner]'s "right to have a lawyer [¶] . . . [¶] [a]nd have him present with you while you're being questioned," stating that "this is an important one because this is the one you told the detectives a couple of minutes ago."  After [petitioner] initialed the form statement of the right to have an attorney, Alger told him: "If you cannot afford to hire a lawyer there will be one to represent you before and during any questioning, you okay, you understand that one?"  [Petitioner] stated that he understood and said "I'm gonna sign here."  Alger then indicated [petitioner] had to affirm "I'm not doing this out of force or fear or anything," and [petitioner] said, "No, no, no, I just, you know, I just, I just, I was thinking about it."

     The form [petitioner] was given only advised him of the nature of his rights.  [Petitioner] claims neither the form nor Alger required [petitioner] to affirmatively

---

     [6]  Alger testified at trial that he did not know what he was referring to when he made this statement.  [Petitioner] maintains that the statement "sounds very much like the beginning of a conversation relating to [petitioner]'s legal predicament," in violation of <u>Edwards v. Arizona</u> (1981) 451 U.S. 477, citing <u>Shedelbower v. Estelle</u> (9th Cir. 1989) 885 F.2d 570, 573-574.  [original footnote renumbered.]

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

14

indicate his willingness to waive those rights, and respondent does not dispute this assertion.  After [petitioner] signed the <u>Miranda</u> form for the last time, Alger asked, "Okay, what is it that you want to tell me?"  After stating that Celentano was a drug dealer and therefore "probably got enemies," [petitioner] told Alger that when he found Celentano's body he called a very close friend who lived nearby and told him "you know what[,] looks like he was hit, you better come over let's see what's happening. [¶] . . . [¶] . . . I didn't run away or anything like that, I'm sitting in the couch waiting."  After he had been questioned by Alger for about 15 minutes, Detective Boffi reentered the room and he and Alger continued interviewing [petitioner] for another 14 minutes. [Petitioner] reminded his questioners several times that "if I took this guy out, I could have got, I've plenty of time to get away."  When asked by Boffi whether he touched the body after he found it, [petitioner] repeatedly said he had not, stating on one occasion he "didn't want to touch anything because of circumstantial evidence."  Later, while Boffi and Pon were out of the room, and [petitioner] had said he was not the one who "took this guy out," Officer Alger told [petitioner] he was trying to "make sure you don't go down for something that could, that couldn't be explained, okay," and "[e]arlier you told me that you had done it in self-defense, so you had killed him and you'd done it. [¶] . . . [¶] . . . The best thing you can do . . . [¶] . . . [¶] . . . is to stick with the story and tell the truth."  [Petitioner] said his claim that he did not kill Celentano was "the truth," and that he earlier said he acted in self-defense "because I was paranoid. Okay? [¶] . . . [¶]  I told you that earlier man, because I didn't know what the fuck to do . . . ."  After Alger said "I'm trying to help you now, before the detectives start coming in here," and insisted "Michael, you killed the guy," [petitioner] responded, "I'm saying I didn't" and reiterated that he previously gave a different story only "because I was scared of my record.  That, honest to God, that's why.  If I had anything to hide . . . I would have ran out of that fucking house and been gone."  Refusing to accept this, Alger asked [petitioner] to "stop lying to me," and said "you tell what happened and it was self-defense, you got a fighting chance."

Detective Boffi then returned to the room and he and Alger continued trying to persuade [petitioner] to affirm his initial statement that he killed Celentano in self-defense.  Despite Officer Alger's revelation that the statements [petitioner] made to him earlier "[are] on tape, dude," and that [petitioner]'s statement to the 911 dispatcher that "you stabbed him because he was hassling you" was also on tape, [petitioner] refused to say he killed Celentano.  At several points [petitioner] threw out the "possibility" that another person killed Celentano and [petitioner] knew who he was but would not disclose his identity.  In the end, [petitioner] stood "with what I told you[,] that I found a dead body.  And its up to you guys to do your job, get the weapons, get the DNA, which you won't have any because I know I didn't do it, uh, the other person involved, I'm not gonna get involved in that, okay?"

Shortly before the interview ended, [petitioner], for the third time, indicated an interest in talking to an attorney, stating, "Okay, so I'm gonna have to, I'm gonna talk to a lawyer and , and just go to Redwood City."  Boffi and Alger ignored this request, though the interview concluded a few minutes later.  Apparently acknowledging that the interview should then have concluded, the district attorney agreed to the redaction of all portions of the tape and transcript after [petitioner] expresses his desire to "talk to a lawyer."  The interview ended at 7:27 a.m. [Petitioner] remained alone in the room for about an hour before the tape was shut off.

(Resp't Ex. C at 9-16.)

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

15

1    In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain

2  warnings must be given before a suspect's statement made during custodial interrogation can be

3  admitted in evidence.  The requirements of Miranda are "clearly established" federal law for

4  purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  Juan H. v. Allen, 408 F.3d

5  1262, 1271 (9th Cir. 2005); Jackson v. Giurbino, 364 F.3d 1002, 1009 (9th Cir. 2004).  Habeas

6  relief should be granted if the admission of statements in violation of Miranda "'had a substantial

7  and injurious effect or influence in determining the jury's verdict.'"  Id. at 1010 (quoting

8  Calderon v. Coleman, 525 U.S. 141, 147 (1998)).  Miranda requires that a person subjected to

9  custodial interrogation be advised that he has the right to remain silent, that statements made can

10  be used against him, that he has the right to counsel, and that he has the right to have counsel

11  appointed.  These warnings must precede any custodial interrogation, which occurs whenever

12  law enforcement officers question a person after taking that person into custody or otherwise

13  significantly deprive a person of freedom of action.[7]  See Miranda, 384 U.S. at 444.

14    Once properly advised of his rights, an accused may waive them voluntarily, knowingly

15  and intelligently.  See id. at 475.  A valid waiver of Miranda rights depends upon the totality of

16  the circumstances, including the background, experience and conduct of the defendant.  See

17  United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).  The government must prove

18  waiver by a preponderance of the evidence.  See Colorado v. Connelly, 479 U.S. 157, 168-69

19  (1986).  The waiver need not be express as long as the totality of the circumstances indicates that

20  the waiver was knowing and voluntary.  North Carolina v. Butler, 441 U.S. 369, 373 (1979).  To

21  satisfy its burden, the government must introduce sufficient evidence to establish that under the

22  totality of the circumstances, the defendant was aware of "the nature of the right being

23  abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S.

24  412, 421 (1986).  Statements made after a defendant's invocation of his Fifth Amendment rights

25  has been ignored by police and questioning has continued uninterrupted do not amount to a

26  _____

27    [7] The court need not address whether petitioner made statements during custodial
interrogation because there is no dispute that petitioner was in custody at the time of

28  questioning.

1    waiver of <u>Miranda</u> rights.  <u>Anderson v. Terhune</u>, 516 F.3d 781, 791 (9th Cir. 2008) (en banc).  A

2    suspect who has expressed a desire to have counsel present during custodial interrogation is not

3    subject to further interrogation by the authorities until counsel is made available to him.  <u>See</u>

4    <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

5           In the instant case, petitioner makes four <u>Miranda</u>-related arguments that collectively, he

6    contends, demonstrate a violation of <u>Edwards</u>.  First, petitioner argues that Alger did not give

7    him <u>Miranda</u> warnings when they initially sat together in the interview room for almost two

8    hours before Boffi and Pon arrived.  (Pet at 11; Pet. Memo at 5.)  The state appellate court found

9    that petitioner was spontaneously making statements and asking Alger questions about the

10   circumstances of the case.  (Resp't Ex. C at 10.)  There is no evidence that Alger engaged in any

11   "words or actions" that were designed "to elicit an incriminating response" from petitioner.  <u>See</u>

12   <u>Pope</u>, 69 F.3d at 1023.  Alger's responses to petitioner's queries were innocuous comments such

13   as "I'm just the taxi driver" and "I have no idea what's going on."  (Resp't Ex. C at 10.)

14          <u>Miranda</u> warnings are only necessary prior to custodial interrogation.  "[I]nterrogation

15   means questioning or 'its functional equivalent,' including 'words or actions on the part of the

16   police (other than those normally attendant to arrest and custody) that the police should know are

17   reasonably likely to elicit an incriminating response from the suspect.'"  <u>Pope v. Zenon</u>, 69 F.3d

18   1018, 1023 (9th Cir. 1995) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)).

19          Based on the foregoing circumstances, the state appellate court reasonably found that

20   Alger did not conduct an interrogation of petitioner during the first hour and fifty minutes in the

21   interview room, thus rendering <u>Miranda</u> warnings unnecessary.  Accordingly, petitioner's first

22   <u>Miranda</u> argument does not support his request for habeas relief.

23          Petitioner's second <u>Miranda</u> claim is that the police continued to interrogate him after he

24   invoked his right to counsel.  (Pet. Memo at 5.)  As discussed above, <u>Edwards</u> mandates that

25   once petitioner expressed his desire for a lawyer, he may not be subjected to interrogation until a

26   lawyer has been made available to him, unless petitioner himself "initiates further

27   communication, exchanges, or conversations with the police."  <u>Edwards</u>, 451 U.S. at 484-485.

28   The state court found that petitioner initiated contact with the police during a conversation with

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

17

1 | Alger in the bathroom, and after being read his <u>Miranda</u> rights a second time, petitioner

2 | implicitly waived his previously invoked Fifth Amendment right to counsel.  (Resp't Ex. C at

3 | 18.)

4 |     This court finds that because Alger's testimony was supported by later statements made

5 | by petitioner after they returned to the interview room, the state court reasonably found that

6 | petitioner re-initiated communication with police regarding the incident.  Alger testified that

7 | "during a conversation in the bathroom, [petitioner] spontaneously indicated a willingness to

8 | resume talking to the police," which was never contradicted by petitioner because he declined to

9 | take the stand at the hearing on the motion to suppress.  (<u>Id.</u> at 17-18.)  Although the

10 | conversation in the bathroom was not recorded, the appellate court found that when they returned

11 | to the interview room and Alger reminded petitioner that he had earlier expressed an interest in

12 | obtaining an attorney, petitioner affirmed his change of mind.  (<u>Id.</u> at 18.)

13 |     As set forth above, a waiver of <u>Miranda</u> rights need not be express; the waiver can be

14 | implied so long as the totality of the circumstances indicates that the waiver was knowing and

15 | voluntary.  <u>Butler</u>, 441 U.S. at 373.  In finding an implied waiver, the state court also cited

16 | petitioner's extensive criminal record: "[petitioner] acknowledged being arrested more than 50

17 | times and detained in jail or prison on 32 different occasions."  (<u>Id.</u> at 19.)  His criminal record

18 | tends to indicate the waiver was knowing and voluntary because it shows that he had extensive

19 | experience with the police and their interrogations and understood his rights.  Moreover, after

20 | Alger read petitioner his <u>Miranda</u> rights again, petitioner "explicitly acknowledged, 'I'm not

21 | doing this in any force or fear or anything.'"  (<u>Id.</u> at 19.)  Based on the foregoing circumstances,

22 | the state court reasonably found that petitioner re-initiated contact with the police, was re-read

23 | his <u>Miranda</u> rights, and made an implied and subsequent express, knowing and voluntary waiver

24 | of those rights.  <u>See</u> <u>Bradshaw</u>, 462 U.S. at 1045-46.  Furthermore the state appellate court also

25 | reasonably found that the questions Alger asked petitioner after he asserted his right to counsel

26 | were routine booking questions that "did not solicit incriminating information but only general

27 | information necessary for Alger to complete the booking process."  (<u>Id.</u> at 19.)  Accordingly,

28 | petitioner's second <u>Miranda</u> argument does not support his request for habeas relief.

1   Third, petitioner argues that his statement to police was made under duress because he

2   was handcuffed for almost two hours before the interrogation began, and he was not provided

3   water or use of a restroom for the first three hours of the interview.  (Pet. Memo at 5.)  To

4   determine the voluntariness of a confession, the court must consider the effect that the totality of

5   the circumstances had upon the will of the defendant.  Schneckloth v. Bustamonte, 412 U.S. 218,

6   226-27 (1973).  "The test is whether, considering the totality of the circumstances, the

7   government obtained the statement by physical or psychological coercion or by improper

8   inducement so that the suspect's will was overborne."  United States v. Leon Guerrero, 847 F.2d

9   1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)); see,

10  e.g., Cunningham v. Perez, 345 F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine

11  plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to give

12  break for food and water); Clark v. Murphy, 331 F.3d 1062, 1073 (9th Cir. 2003) (holding that

13  state court's determination that interrogation was non-coercive, where suspect was interrogated

14  over 5-hour period in 6 by 8 foot room without water or toilet was objectively reasonable

15  application of Schneckloth).

16      The state appellate court found that petitioner was not placed under duress due to a

17  refusal to provide water or use of a restroom, stating that "the videotape does not show

18  [petitioner] was denied these amenities for any significant period of time after he asked for

19  them."  (Resp't Ex. C at 19.)  Although the state appellate court did not specifically address the

20  almost two hour delay before the interview began, the record shows that petitioner was kept

21  handcuffed due to safety reasons, and that lead investigator Boffi had to come to the police

22  station from his home, which was an hour away, when he learned of the stabbing.  (RT 159-160;

23  184-187.)  Under these circumstances, the state appellate court reasonably found that petitioner's

24  statements to the police were not involuntary due to coercion or duress.  Accordingly,

25  petitioner's third Miranda argument does not support his request for habeas relief.

26      Fourth, petitioner argues that police ignored petitioner's second and third requests for an

27  attorney by continuing to ask him questions.  (Pet. Memo at 6.)  The state appellate court agreed,

28  but found that "[petitioner]'s complaint that the police did not cease questioning him

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

19

1  immediately after his third request for an attorney is insignificant.  The brief questioning, which

2  revealed nothing new, was redacted from the tape and transcript of the interview, and not used at

3  trial." (Resp't Ex. C at 19.)

4        Miranda provides for warnings requirements effective to secure the Fifth Amendment's

5  privilege against self-incrimination.  The remedy for a violation of these requirements is the

6  suppression, at the subsequent trial, of the statements made incriminating the defendant in the

7  crime about which he was questioned.  Miranda, 384 U.S. at 479; see Jackson v. Giurbino, 364

8  F.3d 1002, 1009-10 (9th Cir. 2004) (because Miranda offers a "bright-line" test for the

9  admissibility of statements made in response to police interrogation, state courts act contrary to

10 clearly established constitutional law when they fail to exclude statements obtained in violation

11 of Miranda).  Because the trial court suppressed the portion of the videotape after petitioner's

12 request for an attorney, the Miranda violation was remedied at trial.  Thus, this court finds that

13 petitioner's fourth Miranda argument does not support his request for habeas relief.

14       Accordingly, the state court's decision rejecting this claim was neither contrary to nor an

15 unreasonable application of clearly established federal law, nor was it an unreasonable

16 determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d).

17       3.    Challenge of Reliability of Petitioner's Statement to Police

18       Petitioner argues that the trial court prevented him from challenging the reliability of his

19 statement to the police in violation of his right to present a defense under the Sixth and

20 Fourteenth Amendments.  (Pet. Memo at 7-8.)  Petitioner also argues that the trial court erred in

21 not instructing the jury about the distinction between a "voluntary" statement and a "reliable"

22 one.  (Id. at 8.)

23       During trial, petitioner sought to cross-examine Alger about the circumstances of the

24 recorded interview with petitioner.  (Resp't Ex. C at 28.)  Petitioner attempted to show that his

25 statements were not reliable because of the police practice of being untruthful to suspects in

26 order to get them to talk.  (Id.)  The trial court ruled that petitioner could not ask Alger questions

27 relating to the voluntariness of petitioner's statements because the court had already decided that

28 the statements were voluntary as a matter of law and advised the jury that they could not consider

Alger's remarks "in the sense of misleading the [petitioner] in some way and thus causing him to make a statement that wasn't legal, because that has already been decided."  (Id.)

> After the jury received this advisement, defense counsel resumed his cross-examination of Alger, asking him, "do you believe that it is all right for a law enforcement officer to lie to a suspect in a criminal case?"  The district attorney immediately objected on the ground the question was "irrelevant."  Defense counsel disagreed, claiming he was only eliciting information that would permit the jury to conclude Alger was being truthful when he told [petitioner] he believed he acted in self-defense.  The court agreed "there is nothing wrong with that," but added that "asking the officer if he thinks it is okay to lie to suspects does not have a place in this," because the law permits it.  The court permitted counsel to continue questioning Alger, so long as the questions related to whether Alger believed what [petitioner] him.  Defense counsel then asked Alger, "Do you believe that it is all right for suspects and defendants to lie to police officers," the district attorney objected, and the court sustained the objection.  Defense counsel then announced he had no further questions.

(Id. at 29.)

The Supreme Court has established that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  In Crane, the state court precluded the defendant from attacking the credibility of his confession because it believed such an attack went towards the voluntariness of the confession. Id. at 685-86.  Because the state court had already determined that the confession was voluntary, it saw no need to examine the confession's credibility.  Id.  The Supreme Court concluded that the manner in which a confession is taken is relevant to both the legal question of voluntariness and the factual issue of a defendant's guilt or innocence.  Id. at 688-89.  As a result, the Court held that although the trial court may rule on the legal question of whether an officer's actions during the interrogation violated the defendant's constitutional rights, such as voluntariness, the state may not exclude evidence pertaining to the manner, circumstances, or content of the interview and thereby prevent the defendant from attacking the reliability or credibility of the statement.  Id. at 689-91.

The state appellate court correctly determined that "[t]he [Supreme Court in Crane] reasoned that evidence about the manner in which a confession was secured, in addition to bearing on its voluntariness, often bears as well on its credibility, a matter that is exclusively for the jury to assess."  (Resp't Ex. C at 30.)  In applying this rule, the state appellate court

1   concluded that, unlike <u>Crane</u>, petitioner's case did not raise significant questions as to the

2   reliability of the incriminating statements. (<u>Id.</u>) The state court found that petitioner, "a 52-year

3   old adult with a long criminal history who had interacted with the police on numerous prior

4   occasions, and knew his rights, was not nearly as easy to intimidate as the juvenile petitioner in

5   <u>Crane</u>." (<u>Id.</u> at 31.) Moreover, "unlike the confession in <u>Crane</u>, [petitioner]'s incriminating

6   statements did not in any way indicate ignorance of facts known to police." (<u>Id.</u>) Furthermore,

7   the jury in petitioner's case was not prevented from receiving evidence of the circumstances in

8   which the incriminating statements were made. (<u>Id.</u>) The state appellate court found that the

9   trial court did not prevent defense counsel from challenging the reliability of petitioner's

10   statements, and that the jury actually watched a videotape of the entire interrogation.

11   Accordingly, the appellate court found that "[t]he trial court did not prohibit [petitioner] from

12   challenging the reliability of his statements to the police." (<u>Id.</u>)

13       This court agrees. First, unlike <u>Crane</u>, there was no blanket exclusion of evidence

14   pertaining to the circumstances of the interrogation because the trial court allowed defense

15   counsel to question Alger as long as it was not related to the voluntariness of the statement.

16   Therefore, petitioner was not prevented from showing other factors of the interrogation, such as

17   his discomfort or need to go to the bathroom, and in fact he did highlight these facts during trial.

18   Moreover, the jury was able to see the interrogation on videotape and could evaluate whether

19   petitioner's statements were reliable based the manner in which they were secured. Furthermore,

20   the testimony that petitioner was attempting to elicit from Alger was not central to his claim of

21   self-defense, it merely served as an attempt to discredit a portion of the state's evidence against

22   him. As demonstrated above, <u>see</u> <u>supra</u> Section B.1, there was substantial evidence against

23   petitioner's theory of self-defense besides his statements to police.

24       Petitioner also challenges the trial court's instruction to the jury regarding the

25   voluntariness of petitioner's statement to Alger. The trial court instructed the jury that "it is not

26   necessarily wrong for an officer to be untruthful with a suspect. That has already been evaluated

27   by the court. That is part of what goes into determining whether a statement is voluntary or not:

28   was it elicited in some illegal means. And without going into the finer points on that, it has been

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

22

1  determined by the court that it was not. [¶] So you may consider the remarks [made] by the

2  officer, I believe, as to whether or not the officer really believed the defendant.  But you can't

3  consider it in the sense of misleading the defendant in some way and thus causing him to make a

4  statement that wasn't legal, because that has already been decided."  (Resp't Ex. C at 28.)

5  Petitioner argues that the jury would have interpreted the instructions as foreclosing any

6  evaluation of the reliability of the statements made, and thus the instructions violated his

7  constitutional rights to have the jury consider the credibility of the statement under Crane.

8        To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

9  the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

10 process.  See Estelle, 502 U.S. at 72.  The instruction may not be judged in artificial isolation,

11 but must be considered in the context of the instructions as a whole and the trial record.  See id.

12 In other words, the court must evaluate jury instructions in the context of the overall charge to

13 the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169

14 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, a habeas petitioner

15 is not entitled to relief unless the instructional error "'had substantial and injurious effect or

16 influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637.  In other words, state

17 prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial

18 error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id.

19 (citation omitted)

20        Petitioner's argument that the trial court committed constitutional error when it instructed

21 the jury that petitioner's statement was "voluntary," without distinguishing its "reliability," is

22 without merit.  There is no evidence that the jury was confused as to the distinction between the

23 voluntariness of petitioner's statement and its reliability.  As the state appellate court noted,

24 "[t]he trial court in this case fully appreciated that its ruling on the voluntariness of [petitioner]'s

25 statements did not prevent the defense from challenging the reliability of those statements, and

26 permitted defense counsel to elicit from Officer Alger testimony that he misled [petitioner] by

27 falsely telling him he believed his version of the killing, and that he did so in order to encourage

28 him to talk."  (Resp't Ex. C at 31 (emphasis in original).)  Furthermore, the trial court instructed

1  the jury pursuant to CALJIC No. 2.70, informing them that they "'are the exclusive judges as to

2  whether the [petitioner] made a confession or an admission,' and, if so, 'whether that statement is

3  true in whole or in part.'"  (Id.)

4          Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5          4.    Trial Counsel's Failure to Move to Strike a Prior Serious Felony Conviction

6          Petitioner claims he is entitled to habeas relief because his trial counsel provided

7  ineffective assistance in connection with two motions to strike petitioner's prior 1980 serious

8  felony conviction.  (Pet. Memo at 10.)  Specifically, petitioner claims that defense counsel was

9  ineffective because counsel should have moved to strike his prior serious felony conviction on

10 two other alternate grounds: (1) the plea to assault with a deadly weapon was not voluntary and

11 intelligent; or (2) the 1980 plea agreement that petitioner plead guilty to assault with force likely

12 to create great bodily injury was violated when petitioner was convicted of assault with a deadly

13 weapon.  (Pet. Memo at 13, 14.)  Petitioner contends that he pleaded guilty in 1980 to assault

14 with force likely to cause great bodily harm, but the conviction was mistakenly recorded on the

15 abstract of judgment as assault with a deadly weapon.  Assault with a deadly weapon counts as a

16 "strike" within the meaning of the Three Strikes law (Cal. Pen. Code § 1170.12(c)(1)) and

17 resulted in petitioner's 2003 murder sentence being doubled, while assault with force likely to

18 cause bodily injury does not count as a "strike."  Petitioner's defense counsel for the 2003

19 murder trial twice sought unsuccessfully to strike petitioner's 1980 conviction based on

20 insufficiency of evidence that the prior conviction was a "strike."  The trial court denied the

21 motions and found that petitioner's prior conviction was a serious felony pursuant to the Three

22 Strikes law.

23         After exhausting his direct appeals, petitioner filed a petition for a writ of habeas corpus

24 in the California Superior Court, arguing that he received ineffective assistance of trial counsel in

25 that counsel failed to properly move to strike the prior serious felony conviction.  The state

26 habeas court ruled that petitioner had not made a prima facie case of ineffective assistance of

27 counsel under Strickland because he had not shown that he was prejudiced by any error on

28 counsel's part.  (Resp't Ex. G at 8.)  The state court's ruling was also based on the fact that

1   petitioner had brought a writ of coram nobis to vacate the prior conviction, which was denied by

2   the San Francisco Superior Court, and was on appeal in the California Court of Appeal.  (Id. at 8-

3   9.)  The state habeas court found that "[d]ocumentation regarding these proceedings are

4   necessary before this court can grant relief, particularly if the Court of Appeal denied relief on

5   any grounds that would be binding on this court."  (Id. at 9.)

6        A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

7   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

8   counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth

9   Amendment ineffectiveness of counsel claim, petitioner must establish two things.  First, he must

10  establish that counsel's performance was deficient, i.e., that it fell below an "objective standard

11  of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-88.

12  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that

13  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

14  proceeding would have been different."  Id. at 694.  A reasonable probability is a probability

15  sufficient to undermine confidence in the outcome.  Id.  There is a strong presumption that

16  counsel's performance falls within the wide range of reasonable professional assistance, and

17  counsel's judgment is entitled to a high degree of deference.  Id. at 689-90.

18        This court finds that the state court's decision was neither contrary to nor an unreasonable

19  application of clearly established federal law, nor was it an unreasonable determination of the

20  facts in light of the evidence presented.  See 28 U.S.C. § 2254(d).  The state court did not address

21  whether counsel's performance was deficient under the first prong of Strickland, however, a

22  review of the record shows that defense counsel's actions were reasonable.  Counsel twice

23  moved to strike petitioner's prior serious felony conviction based on the fact that an ambiguity in

24  the record of the plea deal created a reasonable doubt as to whether petitioner's previous

25  conviction counted as a "strike."  Although petitioner claims that counsel should have argued the

26  motion on alternate grounds, counsel's strategy in attacking the prior conviction was informed

27  and based on precedent that he presented to the judge, thus it is accorded deference.  See Sanders

28  v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  Moreover, regardless of whether petitioner's

1  proffered alternate grounds were "likely to succeed," the question is not what counsel could have

2  done, but whether what he did was reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173

3  (9th Cir. 1998).

4          Additionally, an analysis of petitioner's two grounds shows that it was objectively

5  reasonable for counsel not to pursue them.  Petitioner's first argument, that counsel should have

6  argued that the plea was not voluntary and intelligent, was foreclosed by state law.  Under

7  California law, a criminal defendant is not authorized to move in the trial court to strike an

8  alleged prior felony conviction, except on the grounds of a Gideon or Boykin-Tahl error.[8]  See

9  generally People v. Allen, 21 Cal.4th 424, 431-36 (1999) (explaining when a defendant can make

10  a motion to strike a prior conviction).  Petitioner was represented by counsel and was given his

11  Boykin-Tahl advisements prior to the 1980 plea.  (Resp't Ex. A at 848.)  Therefore, defense

12  counsel could not have successfully argued in the motion to strike that the plea was not voluntary

13  and intelligent.

14          Petitioner's also argues that defense counsel should have argued that the 1980 plea

15  agreement was violated.  However, the record clearly demonstrates that petitioner pleaded guilty

16  to Count 3 of the information, which was assault with a deadly weapon.  (Resp't Ex. A at 842,

17  849.)  Whether it was petitioner's (and the district attorney's) intent for petitioner to plead to

18  assault with force likely to produce great bodily injury is speculative because the record is

19  somewhat ambiguous.  (Resp't Ex A at 844-50.)  Therefore, it cannot be said that defense

20  counsel's decision not to pursue this course was unreasonable.

21          This court finds that counsel's actions regarding the motions to strike were based on

22  tactical decisions.  Petitioner has failed to rebut the presumption that defense counsel's

23

24

25

26          [8] Gideon involved the denial of counsel.  Gideon v. Wainwright, 371 U.S. 335 (1963).

27  Boykin-Tahl rights involve a defendant's right to be informed that by pleading guilty he
    forfeits his right to a jury trial, to confront and cross-examine witnesses, and to be free of

28  compelled self-incrimination.  See People v. Sumstine, 36 Cal. 3d 909, 914 (1984).

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

26

1  performance was reasonable.[9]  See Strickland, 466 U.S. at 689.  Accordingly, the state court did

2  not apply Strickland in an objectively unreasonable manner, and petitioner is not entitled to

3  habeas relief on this claim.

4       5.      Appellate Counsel's Failure to Raise the Issue of Improper Denial of Motion to
                Strike the Prior Conviction

5

6  Petitioner claims that his appellate counsel provided ineffective assistance by not

7  complaining of the trial court's improper denial of a motion to strike a prior conviction.  (Pet.

8  Memo at 17.)  Petitioner argues that his appellate counsel could have raised the same issues that

9  petitioner included in claim four in the instant habeas petition.  (Id. at 18.)

10      The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

11 the effective assistance of counsel on his first appeal as of right.  See Evitts v. Lucey, 469 U.S.

12 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed

13 according to the standard set out in Strickland.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.

14 1989).  A defendant therefore must show that counsel's advice fell below an objective standard

15 of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional

16 errors, he would have prevailed on appeal. Id. at 1434 & n.9 (citing Strickland, 466 U.S. at 688,

17 694).  It is important to note that appellate counsel does not have a constitutional duty to raise

18 every nonfrivolous issue requested by defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54

19 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of

20 effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel therefore will

21 frequently remain above an objective standard of competence and have caused his client no

22 prejudice for the same reason--because he declined to raise a weak issue.  Id.

23      The state habeas court found that, similar to the previous claim, petitioner had failed to

24 sufficiently allege that he was prejudiced by any deficient performance on counsel's part.

25 (Resp't Ex. G at 10.)

26      This court finds that the state habeas court reasonably found that appellate counsel did not

27

28      [9] Because petitioner cannot establish that counsel was incompetent under the first prong of
Strickland, it is unnecessary to analyze the prejudice prong.  See Siripongs, 133 F.3d at 737.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

27

provide ineffective assistance under <u>Strickland</u>.  As previously shown, even if appellate counsel had raised petitioner's proffered grounds on appeal, they were not likely to prevail.  The trial court found that it was undisputed that in 1980, petitioner pleaded guilty to Count 3 of the information, which was assault with a deadly weapon and is considered a "strike."  The actual intent of the parties was ambiguous from the record.  Therefore, it cannot be said that appellate counsel's decision to forego this claim on appeal was incompetent, nor was it prejudicial.  Accordingly, the state court's decision rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  <u>See</u> 28 U.S.C. § 2254(d).

   6.   <u>Trial Counsel's Failure to Object to the Admission of Evidence Regarding the Victim's Character</u>

Petitioner claims that trial counsel provided ineffective assistance when he failed to object when the prosecution elicited testimony about the victim's non-violent nature.  (Pet. Memo at 18.)  Petitioner argues that admission of the victim's character was inadmissible under California Evidence Code § 1101(a), and that trial counsel should have objected to its admission or in the alternative moved for a mistrial.  (<u>Id.</u> at 10-20.)

As discussed above, ineffective assistance of counsel claims are analyzed under <u>Strickland</u>.  A failure to object to inadmissible evidence may constitute ineffective assistance of counsel.  <u>Crotts v. Smith</u>, 73 F.3d 861, 866 (9th Cir. 1996).  The state habeas court found that petitioner was arguing the "flip side" of Claim One of the instant petition, specifically "that it was error to admit evidence of the victim's easy going and nonviolent character."  (Resp't Ex. G at 11.)  The state habeas court concluded that because the state appellate court had already decided that exclusion of defense evidence showing the victim's aggressive behavior was harmless error, <u>see</u> <u>supra</u> Section B.1, petitioner could not seek habeas relief on the issue because it was resolved on appeal, and thus there was no prejudice from any alleged error by trial counsel.  (<u>Id.</u>)

This court finds that petitioner's argument is without merit.  This court need not consider whether counsel's performance was deficient because petitioner cannot show prejudice.

Petitioner fails to make any showing that the result of the proceedings would have been different had his trial counsel objected to the witnesses' observations that they had never seen the victim violent. The defense never argued that Celentano had a propensity for violence,[10] nor did the witnesses' testimony contradict the defense's theory that petitioner killed Celentano in self-defense. At worst, the evidence is irrelevant, and any error would have been harmless because Celentano's history of non-violence was not disputed. As demonstrated above, the evidence that petitioner did not act in self-defense was substantial. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

**CONCLUSION**

For the reasons set forth above, the court concludes that petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

IT IS SO ORDERED.

DATED: _3/23/10_____

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge

---

[10] Petitioner attempted to show that Celentano became violent on one occasion due to alcohol withdrawal. However, this evidence merely demonstrates that aggressive behavior was a symptom of Celentano's alcohol withdrawal, not that Celentano was inherently violent and aggressive by nature.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.08\Connolly797hc.wpd

29